872 F.2d 465
 277 U.S.App.D.C. 30
 NORTHWESTERN INDIANA TELEPHONE COMPANY, INC. and Northwest
Indiana CATV, Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
U.S. Telephone Association, Bell Atlantic Telephone Company,
National Cable Television Association, Inc., U.S.
Cable Television Association, Inc., U.S.
Cable of Northern Indiana, Intervenors.
 No. 88-1521.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 6, 1989.
Decided April 11, 1989.
 
 Russel D. Lukas, with whom David L. Nace, Washington, D.C., was on the brief, for petitioners.
 John Thorne, Washington, D.C., for petitioner local phone company, and also entered an appearance for intervenor Bell Atlantic Telephone Co.
 Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel, F.C.C., Gregory M. Christopher, Counsel, F.C.C., Catherine G. O'Sullivan and Marion Jetton, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 
 
 1
 H. Bartow Farr, III, with whom Brenda L. Fox, Michael S. Schooler, David L. Nicoll and Charles H. Helein, Washington, D.C., were on the brief, for intervenors.
 
 
 2
 Martin T. McCue and William Malone, Washington, D.C., entered appearances for intervenor U.S. Telephone Ass'n.
 
 
 3
 James R. Young and Robert A. Levetown, Washington, D.C., entered appearances, for intervenor Bell Atlantic Telephone Co.
 
 
 4
 J. Christopher Redding, Washington, D.C., also entered an appearance, for intervenor U.S. Cable of Northern Indiana.
 
 
 5
 Before WALD, Chief Judge, and ROBINSON and STARR, Circuit judges.
 
 
 6
 Opinion for the Court filed by Circuit Judge STARR.
 
 STARR, Circuit Judge:
 
 7
 This case is before us a second time. Previously, the court remanded the case to the Federal Communications Commission for clarification of the definitions, under the FCC's cross-ownership regulations, of "affiliate" and "carrier-user" relationships between telephone and cable television companies. Northwestern Indiana Telephone Co. v. FCC, 824 F.2d 1205 (D.C.Cir.1987) ("NITCO I"). The FCC having now responded adequately to the concerns that prompted remand, we deny the petition for review.
 
 
 8
 * To recap briefly the pertinent facts: In March 1985, the FCC determined that Northwestern Indiana Telephone Company ("NITCO") had violated the FCC's cross-ownership rules by virtue of its direct and indirect connections with Northwest Indiana CATV, Inc. ("Northwest"). Comark Cable Fund III, 100 FCC2d 1244, recon. denied. 103 FCC2d 600 (1985). The FCC's cross-ownership rules prohibit a telephone company from providing "cable television service to the viewing public in its telephone area, either directly, or indirectly through an affiliate." 47 C.F.R. Sec. 63.54(a) (1988). The regulations also prohibit a telephone company from providing "channels of communications or pole line conduit space" to affiliated cable operators, 47 C.F.R. Sec. 63.54(b) (1988). The pivotal term "affiliate" is broadly defined to include "any financial or business relationship whatsoever by contract or otherwise, directly or indirectly between the carrier and the customer, except only the carrier-user relationship." 47 C.F.R. Sec. 63.54 Note 1(a) (1988).
 
 
 9
 When this case made its first appearance here, the FCC had concluded that each of seven relationships between NITCO (through its president Robert Mussman) and Northwest (through Robert Mussman's son, Rhys Mussman, the president and founder of Northwest) "was and continues to be prohibited by Section 63.54 of our Rules." J.A. at 1598. These relationships were: (1) Robert Mussman's guarantee of bank loans to Northwest; (2) Robert Mussman's guarantee of an indemnity agreement between Rhys Mussman and the Town of Hebron, which received cable service from Northwest; (3) NITCO's payment to Rhys Mussman of consulting fees in excess of Rhys' former salary as Executive Vice President of NITCO; (4) Robert Mussman's lease of office space to Northwest; (5) Robert Mussman's sublease of property to Northwest for "head-end" signal-receiving facilities; (6) NITCO's construction and maintenance of signal distribution facilities for Northwest; and (7) NITCO's lease of pole space to Northwest. J.A. at 1598-99.
 
 
 10
 Upon review, we discerned two problems with the Commission's order. First, we questioned whether, by stating that each of the foregoing transactions (or relationships) was prohibited, the Commission meant to say that affiliate status could be achieved merely by a telephone company's leasing pole space or by its constructing distribution channels for a cable company. We noted that under such an approach telephone companies might be prohibited (under section 63.54(b)) from ever providing pole space or distribution channels to cable companies. This result seemed contrary to section 63.57 of the regulations, which provides that the Commission may permit telephone companies to furnish pole space or distribution capacity to non-affiliated cable companies. NITCO I, 824 F.2d at 1209; see also General Tel. Co. of California v. FCC, 413 F.2d 390, 395-401 (D.C.Cir.1969) (FCC may require telephone companies to obtain a certificate of public convenience and necessity before constructing cable distribution facilities).
 
 
 11
 Second, we recognized that the Commission had, on two prior occasions, permitted telephone companies to construct distribution channels for cable operators. NITCO I, 824 F.2d at 1208-10, citing, The Ohio Bell Tel. Co., 100 FCC Rcd 942 (1986) ("Ohio Bell "); The Chesapeake & Potomac Tel. Co., 57 Rad.Reg.2d 1003 (1985) ("C & P "). In each of these cases, the Commission had relied on the "carrier-user" exception to the cross-ownership regulations' definition of "affiliate." In its initial orders, however, the FCC did not fully explain why this exception was not also applicable to NITCO and Northwest. We thus directed the Commission to elucidate the essential elements of "affiliate" status and the "carrier-user" exception.
 
 
 12
 On remand, the FCC explained that it had not intended to treat the leasing of pole space as an indicator of affiliation. J.A. at 2016. Instead, the Commission clarified that "the lease of pole space was a prohibited relationship solely because of our finding of affiliation for other reasons." Id. The FCC then reaffirmed its conclusion that NITCO and Northwest were affiliated, relying on the indicia of affiliation in its previous order (except, of course, the lease of pole space) and five other NITCO-Northwest linkages.[1]
 
 
 13
 Turning to the alleged inconsistency between the treatment afforded NITCO and that afforded the telephone companies in Ohio Bell and C & P, the Commission explained:
 
 
 14
 The carrier-user relationship ... contemplates transactions that entail a general offer to provide on an indiscriminate basis substantially the same service or services to any and all similarly-situated companies or members of the public.... It is NITCO's failure to deal with Northwest on common carrier terms that causes us to conclude that there was no carrier-user relationship.
 
 
 15
 J.A. at 2016. In contrast, the telephone companies in Ohio Bell and C & P qualified for carrier-user status because, incident to their certificates of public convenience and necessity, they were obligated to offer cable facilities on a common-carrier basis. J.A. at 2016, 2018 n. 28.
 
 II
 
 16
 Petitioners' primary contention is that the FCC has, notwithstanding its effort to do so, failed adequately to distinguish the present situation from those in Ohio Bell and C & P. In particular, they assert that the telephone companies in those two cases also extended credit, entered into consulting agreements or leased property to cable operators. But these similarities are, upon analysis, beside the point. As we have seen, the FCC did not approve the cable facilities in Ohio Bell and C & P on the ground that no financial or business relationship existed between the telephone and cable companies. Instead, the Commission in those two cases relied on the telephone companies' willingness to serve cable companies on a common-carrier basis. As the FCC emphasized on remand, NITCO, unlike the telephone companies in Ohio Bell and C & P, failed to avoid the legal consequences of affiliation by offering to serve cable operators on that open-ended basis.
 
 
 17
 Relatedly, petitioners contend that the FCC failed to provide adequate notice that a telephone company could escape the adverse consequences of affiliation by holding itself out as a common carrier. See RKO General, Inc. v. FCC, 670 F.2d 215, 222-24 (D.C.Cir.1981) (regulated parties must have reasonable notice of prohibited conduct). The same contention, however, was rejected in our prior decision. There, we stated that the carrier-user exception "apparently refers to the offerings of a common carrier" and concluded that "we do not see how petitioners could reasonably have believed that all of their interconnections fell within that exception." NITCO I, 824 F.2d at 1208 & 1209 n. 4. This resolution constitutes the law of the case and, as such, represents a complete answer to petitioners' argument in this respect.[2] See C. Wright & A. Miller, 18 Federal Practice & Procedure Sec. 4478 (1981).
 
 
 18
 Petitioners quibble that Ohio Bell and C & P should not have been deemed qualified for the carrier-user exception because in each case only one cable company was ultimately awarded a franchise. But this observation fails to distinguish between the availability of common carriage services, on the one hand, and, on the other, the actual provision of common carriage to multiple cable operators. As we understand it, the FCC's interpretation of the carrier-user exception requires only the former (i.e., standing ready to provide common carrier services to any and all users). Indeed, the Commission has placed much emphasis on the fact that Ohio Bell and C & P assumed an obligation (by virtue of their certificates of public convenience and necessity) to provide cable facilities on a common carrier basis. J.A. at 2016, 2018 n. 28. From all that appears, then, the existence of only one franchisee in both the Ohio Bell and C & P settings resulted not from the telephone companies' refusal to provide common carriage, but from the licensing decisions of the local governments involved. In contrast, the FCC found that NITCO refused to offer similar terms to a competing cable company and reasonably took account of the fact that NITCO has claimed throughout these proceedings that it could serve Northwest on a nontariff basis, that is, without obtaining a certificate of public convenience and necessity. J.A. at 2016.
 
 
 19
 Petitioners further contend that in its most recent order the FCC has impermissibly based its finding of affiliation on the totality of the circumstances, instead of specifying which transactions are prohibited by the rules. Petitioners cite Leflore Broadcasting Co. v. FCC, 636 F.2d 454, 463 (D.C.Cir.1980) for the proposition that such a "gestalt" approach to agency decision-making is unacceptable. Not quite. In Leflore, we stated that an agency normally should not explain its choice of remedies in "gestalt" terms because if one or more elements of the gestalt were flawed, remand might be required to insure that the agency still viewed the particular remedy imposed as appropriate. A Leflore -type remand is, however, completely uncalled for here because petitioners have, in light of the regulations' broad sweep, failed to demonstrate that any of the indicia relied upon by the FCC for its finding of affiliation was improper. Indeed, in LeFlore the court declined to impose a remand for similar reasons. Id. at 463 and n. 83.
 
 
 20
 In sum, the FCC's interpretation of the carrier-user exception reasonably took into account the fact that Ohio Bell and C & P evinced a willingness to deal with cable companies on a common carrier basis, whereas NITCO did not.
 
 III
 
 21
 Petitioners and intervenors, the United States Telephone Association and the Bell Atlantic Corporation, attempt to assert various challenges not raised in the initial proceedings before the Commission and this court. Specifically, petitioners argue that the FCC's cross-ownership regulations cannot continue to be applied in light of the Cable Communications Policy Act of 1984, 47 U.S.C. Sec. 521 et seq. (Supp.1986), which became effective after initiation of this action, but prior to the Commission's initial order. Petitioners further contend that the cross-ownership prohibitions are unconstitutional on their face and as applied. For their part, the intervenors go even further and contend that the cross-ownership provisions as contained in the Cable Act are facially unconstitutional.
 
 
 22
 Confronted with this rather daunting fusilade, we refuse to engage in the invited widened battle; in our view, consideration of these arguments cannot be reconciled with well-established principles of waiver, exhaustion of remedies and law of the case.
 
 
 23
 First. It is elementary that where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand. Laffey v. Northwest Airlines, 740 F.2d 1071, 1089-90 (D.C.Cir.1984). This widely-accepted rule furthers the important value of procedural efficiency, 18 C. Wright & A. Miller, Federal Practice & Procedure Sec. 4478 (1981), and prevents the "bizarre result" that "a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." Laffey v. Northwest Airlines, 740 F.2d at 1089-90, quoting Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir.1981), cert. denied, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). To be sure, Laffey involved a statutory question (failure to contest a formula for calculating back-pay under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982)), but its logic applies to constitutionally grounded arguments as well. This is especially so where, as here, none of the parties have come forward with an explanation (beyond inadvertence) for the failure to properly present these issues in the initial appeal.[3]
 
 
 24
 Second. Petitioners' Cable Act-based and "as applied" constitutional arguments are also barred by section 405 of the Federal Communications Act. That familiar provision states, in pertinent part:
 
 
 25
 The filing of a petition for rehearing shall not be a condition precedent to judicial review of [an FCC decision] except where the party seeking such review ... relies on questions of law and fact upon which the Commission ... has been afforded no opportunity to pass.
 
 
 26
 47 U.S.C. Sec. 405 (1982). We have repeatedly held that section 405 codifies time-honored exhaustion principles, including the "general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 680-82 (D.C.Cir.1983) quoting, United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (emphasis supplied); see also City of Brookings Mun. Tel. Co. v. FCC, 822 F.2d 1153, 1163 & n. 26 (D.C.Cir.1987).
 
 
 27
 In this case, there can be no question that petitioners did not present their Cable Act and "as applied" constitutional claims in the initial proceedings before the FCC. NITCO I, 824 F.2d at 1209-10 n. 8. Petitioners contend, however, that section 405's exhaustion requirement has been met by virtue of the FCC's having enjoyed an "opportunity" on remand to address these claims. As we just noted, however, exhaustion principles normally require compliance with the agency's procedural rules (and rulings). The relevant inquiry is thus whether, in light of petitioners' initial failure to raise constitutional and statutory issues, the Commission erred in not addressing these arguments on remand. We think not.
 
 
 28
 The Commission determined that consideration of new arguments was not required by the terms of our remand and would not be in the public interest. J.A. at 2019 n. 40. That conclusion is unexceptionable. Petitioners admit that nothing prevented them from advancing these arguments in the initial proceedings. That being so, the FCC has simply refused to allow petitioners to secure, by virtue of the fortuity of our remand, a second opportunity to comply with the exhaustion requirements embodied in section 405. The efficiency and fairness values served by exhaustion principles would be seriously compromised if agencies were obliged to furnish such second bites at the apple.[4]
 
 
 29
 Finally, it should go without saying that our decision in Meredith Corp. v. FCC, 809 F.2d 863 (D.C.Cir.1987) does not ordain a different exhaustion regime for constitutional claims. In Meredith, the FCC (consistent with its procedural rules) granted a motion for reconsideration raising a new constitutional argument. The Commission conceded that it viewed the constitutional objection as meritorious, but it decided, for its own reasons, to ignore the argument and proceed with its enforcement action. In that context, this court held that an agency could not ignore a properly presented constitutional claim advanced in an enforcement proceeding. Id. at 869-70. Here, in contrast, the FCC reasonably declined to address new arguments on remand.
 
 
 30
 Third. Petitioners' Cable Act and "as applied" constitutional arguments run afoul of the doctrine of law of the case, which normally prevents a court from revisiting issues that have been expressly (and in some cases impliedly) resolved on a first appeal. 18 C. Wright & A. Miller, Federal Practice & Procedure, Sec. 4478 (1981). One week prior to oral argument of their first appeal, petitioners attempted (via a supplemental brief) to raise the Cable Act and "as applied" constitutional arguments. The earlier panel rejected this contention, explaining that petitioners had failed to comply with section 405's exhaustion requirement. NITCO I, 824 F.2d at 1210-11 n. 8. We also observed that the Cable Act argument represented a particularly poor candidate for first-time consideration on appeal because petitioners had actually argued before the Commission that the Cable Act did not apply to their case. Id. Especially in this horse-switching-in-midstream context, law of the case principles provide an additional basis for our determination not to consider petitioners' Cable Act and "as applied" constitutional contentions.[5]
 
 
 31
 * * *
 
 
 32
 * * *In sum, the constitutional and Cable Act-based challenges to the cross-ownership rules are not properly before us. The Commission has, moreover, demonstrated that its orders are based on a reasonable interpretation of the cross-ownership regulations and the Commission's prior precedents. Accordingly, the petition for review is
 
 
 33
 Denied.
 
 
 
 [1]
 The five indicators of affiliation highlighted by the Commission on remand were: (1) Rhys Mussman's serving as NITCO's Executive Vice-President at the same time that he operated Northwest as an individual proprietorship; (2) Rhys Mussman's responsibility, while serving as NITCO's Executive Vice-President, for negotiating pole attachment agreements with competing cable companies; (3) the fact that all contractual agreements between NITCO and Northwest were originally oral; (4) the fact that the consulting agreement between NITCO and Rhys Mussman was oral; and (5) Rhys Mussman's representations to city franchising officials that he was Executive Vice-President of NITCO and his father was Secretary-Treasurer of Northwest. J.A. at 2016
 
 
 [2]
 In any event, we note in passing that petitioners' present predicament cannot reasonably be attributed to the alleged vagueness of the cross-ownership regulations. First, it was established long ago that telephone companies are required to obtain Commission approval before constructing or operating cable distribution channels. General Tel. Co. of California v. FCC, 413 F.2d at 309 (D.C.Cir.1969). The application process itself would have provided NITCO, ex ante, with particularized regulatory guidance, yet NITCO never sought the required approval. Petitioners have also failed to convince that the Commission's interpretation of the carrier-user exception is unprecedented. The need to eliminate favored treatment of telephone company affiliates is, of course, the cross-ownership rules' raison d'etre. In the Matter of Applications of Telephone Companies for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems, 21 FCC Rcd 2d 307, 323-26 (1970) ("Cross-Ownership Rules"). Indeed, the Commission explained its decision in C & P, in part, by reference to C & P's "willingness to provide equivalent facilities to others on like terms." The Chesapeake & Potomac Telephone Company, 57 Rad.Reg.2d 1003, 1006 (1985); see also, Comark Cable Fund III v. Northwestern Indiana Telephone Company, 103 FCC2d 600, 609 (1985) (distinguishing C & P on the ground that "we granted an application, duly filed pursuant to Section 214(a) of the Act and our cross-ownership rules, which had sought certification that the public interest would be served by the construction there proposed; ... a public offering to be tariffed at the Commission was involved and thus, a 'carrier-user relationship' within the meaning of the sole exception to the broad language in Note 1(a) to Section 63.54." (emphasis supplied)
 
 
 [3]
 The Laffey rule is of particular importance with respect to the facial constitutional arguments, because such arguments are not generally subject to exhaustion requirements. Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)
 
 
 [4]
 The same reasoning disposes of petitioners' contention that their constitutional and Cable Act claims are properly presented because the FCC has been afforded an "opportunity" to pass on these issues in a still-pending rulemaking proceeding. Compare Great Falls Community TV Cable Company Co. v. FCC, 416 F.2d 238, 239-40 (9th Cir.1969) (exhaustion of administrative remedies futile where contrary agency position clarified by recently concluded rulemaking)
 
 
 [5]
 Our ultimate conclusion that Cable Act claims are not properly presented dooms petitioners' argument that the Commission's divestiture order cannot be reconciled with Eagle Telecommunications, Inc., 54 Rad.Reg.2d 1124 (1983), recons. granted, 59 Rad.Reg.2d 1243 (1985). In that case, the Commission initially required Eagle to divest itself of cable facilities constructed in violation of the cross-ownership regulations. While review of the order was pending, however, the Cable Act became effective. Eagle then obtained relief from divestiture on the ground that its facilities came within the broadened rural exemption contained in the Cable Act. Petitioners urge that, under Eagle, the Cable Act must be applied to their case and that divestiture is inappropriate because the Cable Act has "overruled" the broad definition of the term "affiliate" in the cross-ownership regulations
 As alluded to previously, however, petitioners, by their own litigation strategy, have lost any claim to the protections of the Cable Act, and this includes Cable Act-based attacks on divestiture. We therefore need not address the intriguing question whether the Cable Act governs enforcement actions commenced before, but pending at the time of, its effective date. See 47 U.S.C. Sec. 533(f) (Supp.1986) (grandfathering clause of Cable Act's cross-ownership provisions); Pipefitters Local Union v. United States, 407 U.S. 385, 432-35, 92 S.Ct. 2247, 2272-74, 33 L.Ed.2d 11 (1972) (discussing the application, vel non, of the savings statute, 1 U.S.C. Sec. 109 (1982), to prosecutions pending at the time of a change in the governing law). For the same reasons, we do not address petitioners' contention that the definition of affiliate in the cross-ownership rules is at odds with the Cable Act.