# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 3, 2010        Decided January 28, 2011

No. 10-7019

MIKEISHA BLACKMAN, BY HER NEXT FRIEND MARY ANN
BLACKMAN, ET AL.,
APPELLEES

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:97-cv-01629)

Stacy L. Anderson, Assistant Attorney General, argued the
cause for appellants. With her on the briefs were Peter J.
Nickles, Attorney General, Office of the Attorney General for
the District of Columbia, Todd S. Kim, Solicitor General, and
Donna M. Murasky, Deputy Solicitor General. Robert C.
Utiger, Attorney, entered an appearance.

Shannen W. Coffin argued the cause for appellees. With
him on the brief were Ira A. Burnim, Lindsey B. Lang, and
Angela L. Lipscomb.

Before: SENTELLE, *Chief Judge*, BROWN, *Circuit Judge*, and
WILLIAMS, *Senior Circuit Judge*.

*Chief Judge* SENTELLE filed an opinion announcing the judgment of the Court.

BROWN, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*, each filed opinions concurring in the result.

SENTELLE, *Chief Judge*: The District of Columbia appeals from an attorneys' fee award pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (IDEA). The District contends, as it did in the district court, that the amount of the fee award ($1,454,030.22) unlawfully exceeds the statutory fee cap of $4000. The district court held that the statutory fee cap of $4,000 was not applicable to a class action as a whole, but instead limited fees to $4,000 for each individual student in the class. For the reasons set forth below, we agree and affirm the judgment of the district court.

## Background

This appeal marks the latest—hopefully, the last or near last—chapter in the saga stretching back at least forty years of families with disabled children seeking free appropriate public education from the District of Columbia with frequent repair to administrative and judicial remedy. The history goes back at least to *Mills v. Board of Education of the District of Columbia*, 348 F. Supp. 866 (D.D.C. 1972). Since *Mills*, the controversy has evolved through both individual and class actions, most recently in two consolidated class actions now before the court. Because the present appeal concerns only the discrete question of the propriety of the fee award, we will not rehash the extended substantive litigation.

In furtherance of the objectives of the IDEA, Congress has provided for the award of attorneys' fees to prevailing parents of children with disabilities. Specifically:

(i) IN GENERAL – In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs–

(I) to a prevailing party who is the parent of a child with a disability.

20 U.S.C. § 1415(i)(3)(B). In many of the numerous actions against the District of Columbia, the courts awarded attorneys' fees pursuant to the IDEA. Beginning in 1998, concerned about the substantial cost to the District, Congress enacted a rider to the FY 1999 annual appropriations act for the District of Columbia instituting the first of a series of attempts at capping the fees awarded. Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, § 130, Pub. L. No. 105-277, 112 Stat. 2681, 2681-138 to 2681-139 (1998). That first fee cap limited attorneys' fee awards in actions against the District of Columbia Public Schools under the IDEA to the rate paid to appointed counsel representing indigent criminal defendants in the District of Columbia. The fee cap was continued in FY 2000 and FY 2001 without significant change. Although Congress made further changes, the enactment pertinent to this action came in legislation enacted for FY 2003 and subsequent years which departed from the formula tying the awards to rates for appointed criminal counsel and instead set a flat $4000 figure as the limitation for "the fees of an attorney who represents a party in an action . . . under the Individuals with Disabilities Education Act . . . ."[1] 2006 District of

---

[1]The full text of the statute reads:

Sec. 122. (a) None of the funds contained in this Act may be made available to pay -

(1) the fees of an attorney who represents a party in an action

Columbia Appropriations Act § 122 (a)(1); Pub. L. No. 109-115, 119 Stat. 2396, 2519 (2005), *cont'd in effect*, Revised Continuing Appropriations Resolution, § 101(a)(9), Pub. L. No. 110-5, 121 Stat. 8, 9 (2007).

Although the fee cap was lifted for proceedings initiated after the effective date of the 2009 appropriations act, the current litigation spans the period of the effectiveness of the cap legislation and is not affected by the termination of fee cap requirements. Therefore, the question before us depends upon construction of the fee cap legislation.

Plaintiffs initiated the *Blackman* class action litigation in July of 1997, and the case was certified as a class action in October of that year. It was subsequently consolidated with another class action, *Jones v. District of Columbia*, in May of 1998. In June of 1998, the district court granted summary judgment in plaintiffs' favor in both consolidated actions, a ruling that the District never challenged. Although that summary judgment terminated the liability issues in plaintiffs' favor, the litigation continued through years of negotiation of the

---

or an attorney who defends an action brought against the District of Columbia Public Schools under the Individuals with Disabilities Act (20 U.S.C. § 1400 et seq.) in excess of $4,000 for that action; or

(2) the fees of an attorney or firm whom the Chief Financial Officer of the District of Columbia determines to have a pecuniary interest, either through an attorney, officer, or employee of the firm, in any special education diagnostic service, schools, or other special education service providers.

(b) In this section, the term "action" includes an administrative proceeding and any ensuing or related proceedings before a court of competent jurisdiction.

remedy phase, which finally produced a consent decree in 2006. While the parties were able to reach consent with respect to the remedy, the question of attorneys' fees remained in dispute.

The District did not contest the claim of plaintiffs' counsel that attorneys' fees were in order under the IDEA, but vigorously disputed the amount of the award. The continuing fee dispute involved two separate fee petitions. The first petition sought attorneys' fees for the nine-year period from the start of the lawsuit through July 26, 2006. The parties agreed that an uncapped computation of the awardable fees for this period would amount to $1,820,000. The District, however, contended that the $4000 statutory fee cap applied. The plaintiffs contended, and the district court held, that the fee cap did not limit fees payable by the District to $4,000 for the entire class action. That is, the statute by its terms applied to the "fees of *an* attorney who represents *a* party in *an* action . . . ." 2006 District of Columbia Appropriations Act § 122(a)(1) (emphasis added). Therefore, the district court ruled that the statute did not govern the fees of attorneys representing multiple members of a class rather than a single party and that plaintiffs' counsel would be entitled to reasonable attorneys' fees "so long as the District's payment of such fees does not exceed $4000 *per plaintiff class member*." *Petties v. District of Columbia*, 538 F. Supp. 2d 88, 96-97 (D.D.C. 2008) ("*2008 Fee Cap Decision*"). The District did not appeal the fee award.

The second of the two fee petitions gives rise to the present appeal. In March of 2009, plaintiffs' class counsel petitioned for attorneys' fees of $1,938,239.70 for monitoring and compliance work from July 26, 2006, when the consent decree was presented to the court, through December 31, 2008. During the ensuing dispute over the amount of the fee and an exchange of legal arguments, including a surreply by the District, the District did not raise any argument regarding the fee cap. Nor did it

raise the issue in a hearing on the fee petition on September 16, 2009. Finally, the District raised the fee cap issue in a supplemental opposition to plaintiffs' request for fees on October 27, 2009, arguing that the $4000 limitation applied to the class action.

On January 4, 2010, the district court entered an order awarding counsel fees in the amount of $1,454,032.22. *Blackman v. D.C.*, 677 F. Supp. 2d 169, 180 (D.D.C. 2010) ("*2010 Fee Award Decision*"). The District filed the present appeal from that order.

## Analysis

The District's appeal is based entirely on its construction of the fee cap statute, which it contends caps the awardable fees in this class action at $4000. Plaintiff-appellees respond that the cap is inapplicable to class actions but governs only the fees of an attorney representing a single party in an action against the District. Before reaching the question of statutory interpretation, we first consider briefly two other issues raised by appellees which they contend preclude the adjudication of the District's argument.

First, appellees contend that the District's argument is barred by the law of the case. Appellees contend that the district court's adoption of their interpretation of the fee cap statute as not applying to class actions in the 2008 Fee Cap Decision, which was not appealed by the District, decides the question. We note that the 2010 order under review did not use the phrase "law of the case," but did seem to invoke it by stating, "the Court has already considered this argument and rejected it." *2010 Fee Award Decision*, 677 F. Supp. 2d at 180. Arguably then, the principle of consistency underlying the law of the case doctrine could be held to preclude the District's argument in the

present case. *See*, *e.g.*, *Arizona v. California*, 460 U.S. 605, 619 (1983) ("[A] fundamental precept of common law adjudication is that an issue once determined by a competent court is conclusive."). However, the district court did not simply rely on its prior ruling as establishing controlling law of the case, but rather reiterated its prior reasoning in explaining that "[d]efendants have given the Court no reason to change its earlier ruling, and it will not do so." 677 F. Supp. 2d at 180. Upon *de novo* review, we reach a similar conclusion on the appropriate construction of the fee cap statute.

Secondly, appellees implicitly argue in their briefing of the law-of-the-case theory that the District did not properly preserve this fee cap issue in the district court and that we should therefore treat the argument as abandoned or forfeited. We are reluctant to treat as forfeited a substantive assertion of error when the appellees themselves have only obliquely asserted such waiver or forfeiture in their presentation of another argument. Therefore, again we will bypass the suggested preclusion of the issue and consider it on the merits.

Our analysis begins with the language of the statute. As the district court stated:

> The plain and unambiguous language of the fee cap statute specifically precludes the District from paying fees in excess of $4000 to "an attorney who represents a party in an action" under the IDEA. See Pub. L. No. 109-115, 119 Stat. 2396, 2519 (2005).

*2010 Fee Award Decision*, 677 F. Supp. 2d 169, 180 (quoting *2008 Fee Cap Decision*, 538 F. Supp. 2d at 96). We agree with this obvious proposition.

We further agree with the district court that class counsel in the consolidated class actions before the court "is not 'an attorney who represents a party in an action' — class counsel in *Petties* and class counsel in *Blackman/Jones* represent hundreds and/or thousands of parties." *Id.* Therefore, on the face of the statute, the district court concluded that

> the cap does not preclude the Court from ordering defendants to pay and — more importantly — does not preclude the defendants from paying reasonable attorneys' fees to the plaintiff classes, so long as the total amount paid by the defendants does not surpass the statutory fee cap multiplied by the total number of members of the plaintiff class.

*Id.*

As it is undisputed that the classes number in the hundreds, if not thousands, the plain and unambiguous language of the statute would seem to make the district court's conclusion unassailable and compel us to affirm the fee award order.

The District, however, contends that we should not stop with the plain and unambiguous language of the statute. The District bases its argument principally on the Dictionary Act, 1 U.S.C. § 1, which states, in relevant part, that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise — words importing the singular include and apply to several persons, parties, or things." Thus, the District argues, the words "an attorney" in the fee cap legislation should include "attorneys" and the words "representing a party" should also include attorneys representing "parties." Under that construction, the District contends, the fee cap would apply to the attorneys representing the parties in class actions and should cap the payable fees at $4000. We do not accept this

interpretation of the fee cap legislation.

By its terms, the Dictionary Act does not apply to pluralize all nouns in all statutes. It is inapplicable if "the context indicates otherwise." The Supreme Court long ago told us that the pluralization rule established in the Dictionary Act "is not one to be applied except where it is necessary to carry out the evident intent of the statute." *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 657 (1924). In the context of the fee cap legislation, even the District concedes that the words "an action" cannot logically be construed to refer to "actions." Such a construction, taken in conjunction with the District's pluralization of the other nouns, would compel the result that an attorney who represented many different parents of disabled children in many different actions could never be compensated past the first $4000. Similarly, if we pluralized "attorney" and "party" but not "action," we would create an anomalous situation. A class action with multiple named class members, each having his or her own attorney, could result in a fee capped at $4000 multiplied by the number of named plaintiffs with separate counsel. But a class action with one or more individual named class members represented by a single attorney would be capped at $4000. Additionally, this construction would provide a perverse incentive for breaking single class actions into inefficient multiple actions to generate larger counsel fees in direct contradiction of Congress's apparent goal at reducing costs.

To return to the admonition of *First National Bank*, the "evident intent" of the statute is to address individual IDEA proceedings, not class actions. We therefore agree with the district court's conclusion that the plain and unambiguous language of the statute controls, and the fee cap is not applicable in this case.

10

Accordingly, the order of the district court is

*Affirmed.*

BROWN, *Circuit Judge*, concurring:   The court affirms the district court's award of more than $1.4 million in attorneys' fees.   This is in addition to an earlier award of $1.8 million in this class action, which has now lasted fourteen years.   These serial fee disputes are the latest chapter in a saga the court describes as "stretching back at least forty years." Maj. Op. 2.   Although the legal result is defensible, the practical effect is reprehensible.   The only segment of the population well-served by this aspect of the IDEA program is the lawyers who litigate these cases.

The District argues that the $4,000 fee cap provides a ceiling even for a class action; the plaintiffs insist the fee cap does not apply to class actions at all.   I agree with the plaintiffs.   But this court apparently concludes that while the cap does not limit fees in class actions to $4,000, it establishes an upper bound.   *See* Maj. Op. 5, 9–10; Williams, J., concurring, at 5.   Thus, counsel in a class action would be entitled to reasonable attorneys' fees so long as the fees do not exceed "$4,000 per student in the class."   Williams, J., concurring, at 5.   Yet the fee cap legislation—reenacted several times—says nothing about class actions.   In the absence of any express prohibition, a court could decide the fee cap is irrelevant to the question of class action fees and resort to a reasonable lodestar calculation.   *See, e.g.*, *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 447 (2003) ("[C]ongressional silence often reflects an expectation that courts will look to the common law to fill gaps in statutory text . . . .").   Because under either approach the bottom line would be indistinguishable, I concur in the result.   But I write separately because I wonder if class actions—which fall outside the fee cap paradigm—should be certified for IDEA claims and because the focus on fee caps seems both futile and pernicious.

I

I begin with the issue of statutory interpretation. We could—and probably should—derive a different principle from congressional silence on the subject of class actions. Since Congress clearly did not contemplate such representative actions and made no provision for compensating broad systemic attacks, the statute's silence challenges the propriety of class actions under the auspices of IDEA. Indeed, the very structure of the statutory scheme undermines the validity of class actions in this context.

When IDEA was enacted in 1975, its goals were lofty but attainable; IDEA aimed to provide a "free appropriate public education" for children with special educational needs. Education of All Handicapped Children Act, Pub. L. No. 94-142, § 612, 89 Stat. 773 (1975) (codified as amended as the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*). (1982). To achieve this goal, IDEA mandated that participating states identify these children and then work cooperatively with parents, teachers, and administrators to develop individualized education plans suitable to each child's needs and abilities. Pub. L. No. 94-142, § 613–14.

IDEA's remedial system was not intended to be adversarial; although Congress anticipated that disagreements would arise that required legal intervention, Congress's aim was to resolve disputes amicably—litigation seemingly was intended as a last resort. *See* Pub. L. No. 94-142, § 615 (listing a due process hearing last on the list of procedural safeguards); *see also* 20 U.S.C. § 1415(e)–(f) (1997). And Congress certainly did not anticipate that attorneys' fees would become the focus of any litigation that ensued. *See* H.R. Rep.

No. 105-670, at 21 (Committee on Appropriations) (deciding in 1999 to cap attorneys' fees so that "the District's compliance with [IDEA] will focus more clearly on teaching and learning rather than on litigation and expensive legal fees").  In fact, Congress affirmed this understanding of IDEA's original purpose as recently as 2005, when it amended the statute to allow a state or local educational agency to recoup attorneys' fees from parents who file frivolous or unfounded complaints.  20 U.S.C. § 1415(h)(3)(B)(i)(II)–(III).  By amending the statute, Congress implicitly recognized that IDEA was being distorted; it was no longer simply a means to improve primary education, but was becoming a breeding ground for vexatious and costly litigation.  *See id.* (permitting state and local agencies to recoup fees when the parent's cause of action was intended "to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation").

IDEA's singular focus on an individualized, cooperative educational approach providing customized remedies makes Congress's neglect of broad-based actions understandable and renders IDEA actions ill-suited to class-wide relief.  The Federal Rules of Civil Procedure demonstrate perfectly why this is so.  Federal Rule of Civil Procedure 23(a) sets forth four prerequisites for the certification of a class.  If those prerequisites are met, a class will only be certified if the plaintiffs can establish their case fits within one of the three categories of subsection (b).

Paragraph (b)(2) of Rule 23, the basis of class certification in this case, *see* Oct. 22, 1997 Mem. & Order Certifying the Class at 2, permits a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  To satisfy this test, class claims must be

"sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This requirement stems from the understanding that even unnamed class members are bound by a Rule 23(b)(2) class action without the opportunity to opt out. *See In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002). Accordingly, cohesiveness is a significant touchstone of a (b)(2) class. *See Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142–43 & n.18 (3d Cir. 1998).

As is probably true for most IDEA-spawned class actions, this class action raises a significant question about whether the class claims are sufficiently cohesive to merit certification. Certainly, at some level of abstraction, a degree of cohesion will exist in almost any putative class. But this does not mean it is prudent to generalize to such a degree, especially when IDEA operates from the premise that each child will have unique disabilities and presumes that each program will be personalized. *See* Pub. L. No. 94-142, § 613–14; *cf. J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1288–90 (10th Cir. 1999) (affirming denial of class certification when alleged "systemic failures" too broadly defined the claims at issue, amounting to a lack of commonality under 23(a)(2)).

Moreover, it is patently evident the District is frequently unable to comply with IDEA. *See, e.g.*, Letter from Patricia Guard, Acting Director of Special Education Programs to Superintendent Gist, at 1 (June 15, 2007), http://www2.ed.gov/fund/data/report/idea/partbspap/2007/dc-aprltr-2007b.doc (last visited Jan. 12, 2011) ("[T]he District of Columbia needs intervention in meeting the requirements of Part B of the IDEA."). The question then is not one of fault but one of remedy—and any remedy will necessarily be unique to a particular child. This means the District's systemic failures have little impact on the ultimate question courts now

face; even assuming the District violated its IDEA obligations as to each plaintiff, any relief will be "dependent upon that particular student['s] needs, capabilities, and the IEP in place for that child." *Blunt v. Lower Merion Sch. Dist.*, 262 F.R.D. 481, 489–90 (E.D. Pa. 2009). In fact, even the class certification and ultimate liability determination in this case did little to achieve the personalized remedies plaintiffs sought; many class plaintiffs proceeded to file individual motions for preliminary injunctions "based on their unique circumstances." Appellants' Br. at 10. That this class action failed to provide the specialized relief plaintiffs desired only further supports the notion that the class action is an inappropriate vehicle for these claims.

Indeed, we have recognized the individual nature of IDEA's remedies, and consequently have declined to fashion "cookie-cutter" compensatory relief. *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005) ("[J]ust as IEPs focus on disabled students' individual needs, so must awards compensating past violations rely on individualized assessments."). I see no reason why these considerations should not be decisive when it comes to class certification, and decisions in several other jurisdictions support this view. *See Blunt*, 262 F.R.D. at 489–90 (refusing to certify a class in part because "individual determinations, which must be made to determine whether a particular student falls within the class definition and whether such student has a cause of action, weigh against certifying this class"); *M.A. ex rel. E.S. v. Newark Public Schs.*, No. 01-3389, 2009 WL 4799291, at *15 (D.N.J. Dec. 7, 2009) (unpublished) (declining to certify a (b)(2) class for lack of cohesion, which resulted from the necessity of individualized circumstances and remedies); *cf. McClendon v. Sch. Dist. of Phila.*, No. 04-1250, 2005 WL 549532, at *4–5 (E.D. Pa. Mar. 7, 2005) (unpublished) (denying class certification because named class

members failed to satisfy Rule 23(a)(4)'s typicality requirement in that the remedy sought was individualized in nature). Because the ultimate relief in an IDEA action is unique to each plaintiff, any putative IDEA class quite arguably suffers from a lack of cohesion. Although it is too late for this court to consider the issue, hereafter courts should give significant consideration to the question of whether a class action is the appropriate vehicle for an IDEA case—at least for one seeking individual remedies.

II

The problem of IDEA litigation is not the only problem that needs a remedy. IDEA's focus from the outset was the child—recognizing that individual children required individualized educational strategies to ensure their learning success, IDEA outlined a cooperative statutory scheme. *See* Pub. L. No. 94-142, § 614 ("A local educational agency . . . shall . . . establish a goal of providing full educational opportunities to all handicapped children, including . . . the participation and consultation of the parents or guardian of such children . . . ."). But the individualized, cooperative educational system IDEA envisioned was quickly overwhelmed in the District of Columbia.

Here the IDEA system is anything but cooperative. Because the District is perpetually unable to comply with IDEA's mandates, parents have sought to enforce their rights in court—a situation IDEA contemplates, but one surely not intended to be the norm. *See* 20 U.S.C. § 1415. It has become so routine to "lawyer-up" and go to court, IDEA has morphed from a system intended to benefit children to a system that provides full employment to a specialized cadre of lawyers. And this case is a perfect (yet terrible) illustration of the transformation IDEA has undergone within the sixty-eight

square miles of the nation's capital. Rather than fulfilling IDEA's promise to educate the individual child, this lawsuit involves more than six-thousand plaintiffs. It has lasted more than a dozen years. Plaintiffs who were in grade school when this case began long ago graduated (or dropped out). Some may have children of their own who are being victimized by the District's dysfunction. If we have learned anything from decades of IDEA litigation, it is this: when the system is broken, litigation will not fix it.

Congress itself has recognized the problems plaguing IDEA litigation in the District, and has attempted to re-order the program's incentives over the last twelve years by enacting statutory caps on the fees attorneys may be awarded for their work representing IDEA plaintiffs. But the fee cap has been limited; each renewal faced strong opposition. Some years the cap was tabled entirely, and as it currently stands, the fee cap only applies retroactively to cases initiated prior to 2009. Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524, 697–98 (2009). As this case and others like it demonstrate, Congress's efforts seem to have been misguided. Congress has focused on attorneys' fees, but fees are only a visible symptom of a more fundamental failure. The District is frequently unable to provide an adequate education for special needs children because the District struggles to provide an adequate education for any children.

Here, the per-pupil costs of education are astronomical, yet the District suffers from an inversely proportionate success rate. For the 2006–2007 school year, the Institute of Education Sciences ("IES") calculated educational spending in the District at $20,596 per pupil, National Center for Education Statistics, http://nces.ed.gov/programs/digest/d09/tables/dt09_186.asp (last visited Jan. 12, 2011) (hereinafter "Table 186"); some

estimates are even higher, Andrew Coulson, *Do You* Still *Think DC Spends only $15,000/Pupil?*, (Feb. 19, 2010) http://www.cato-at-liberty.org/do-you-still-think-dc-spends-o nly-15000pupil/ (last visited Jan. 12, 2011) (follow "Excel spreadsheet file" link to 2008–2009 data sheet) (calculating the annual cost per pupil to be $28,169.91 in 2009). Even using the lower figure for consistency across comparisons, this means the District outspends some of the most heavily populated states, including California ($9,364), Florida ($9,391), Pennsylvania ($12,440), New York ($17,818), and Texas ($8,798). Table 186. In fact, according to the IES compilation, the District outpaces every single state in per-pupil spending. *Id.* But the District's graduation rate is well-below the national average, which was 74.7% in 2004–2005 (the last year for which data was available). National Center for Education Statistics, http://nces.ed.gov/pubs2009/dropout07/tables/table_13.asp (last visited Jan. 12, 2011). For that same period, the District's graduation rate was 68.8%—the twelfth lowest rate in the country. *Id.* And IDEA litigation costs the District in excess of $10 million each year in attorneys' fees. D.C. Office of the Att'y Gen. http://newsroom.dc.gov/show.aspx/agency/occ/section/2/relea se/15655/year/2008 (last visited Jan. 12, 2011).

All that money has failed to stem the tide of IDEA litigation. This tiny district with fewer than 50,000 pupils has more IDEA suits than the largest school systems in the nation. *See* Deborah K. Nichols, Auditor, Office of the District of Columbia Auditor, *Flawed Processes and Ineffective Systems of Accountability Pertaining to DCPS' Special Education Program Have Resulted in Costly Legal Fees and Exorbitant Charges for Related Services and Nonpublic Tuition*, at 24 (May 9, 2003) http://dcauditor.org/dca/reports/dca0303.pdf (last visited Jan. 12, 2011) (explaining that in 2002, the District

of Columbia Public Schools received more due process hearing requests (3,044) than the entire state of California (2,670), even though the District's entire student population numbers less than 50,000, while in California the special education population alone numbers 670,000 students).

The solution to the District's failure as an educational provider is not mysterious. It does not depend on how well or how poorly lawyers get paid for representing dissatisfied parents. Even in the District, there are bright spots. For example, the Seed School, which is a charter school serving the District of Columbia, has experienced a 96% rate of college acceptance and a 95% rate of college enrollment among its students. The Seed School of Washington, http://www.seedschooldc.org/ (last visited Jan. 12, 2011). And the Seed School achieves these successes educating the very same children the District is unable to assist; in fact, the Seed School accepts applications on a lottery basis, ensuring that selection is not based on demonstrated academic ability. The Seed School of Washington, *Admissions*, http://www.seedschooldc.org/page.php?pid=63 (last visited Jan. 12, 2011). Similarly, the Friendship Public Charter School, which is publicly funded in its entirety, has produced significant results; students have exceeded state academic requirements for six years running. Friendship Public Charter School, *About: Welcome from the Chairman*, http://www.friendshipschools.org/RelId/606513/ISvars/defaul t/Welcome_from_the_Chairman.htm (last visited Jan. 12, 2011). Programs like those offered by the Seed School and the Friendship Public Charter School demonstrate that these children can achieve academically, if given the proper guidance. But such guidance need not necessarily take the form of paid legal representation. The sixty-eight square miles of the federal city probably has more JDs and PhDs per capita than any other spot in America, yet it lags behind states

like Pennsylvania and Ohio where parents are often guided through the IDEA process by a corps of parent volunteers. *See, e.g.*, Dr. Edward Feinberg, *The Role of Attorneys in Special Education Mediation*, http://www.mediate.com/articles/cadre4.cfm (last visited Jan. 12, 2011) (discussing Pennsylvania's system of non-attorney "advocates" and Ohio's successful parent mentor program).

The District of Columbia Public Schools' biggest problem should be having more pro bono services offered than it can use. Instead, in the bizarro world inhabited by the District, the more its student population shrinks, the bigger its legal bills grow. If there is an answer to this problem, it will likely come from concerned parents, committed teachers, and conscientious volunteers. One thing is clear. It will not come from adjusting the spigot directing the flow of public funds to lawyers.

WILLIAMS, *Senior Circuit Judge*, concurring in the judgment: I write separately to explain why appellees' purported "law of the case" argument must be rejected and to offer a somewhat different interpretation of the statute from that of Chief Judge Sentelle.

*Law of the Case; Waiver and Forfeiture*

Under the doctrine of "law of the case," a court may decline to reconsider the merits of its own prior rulings when the same point of law arises for the second time in the same case. The panel rightly notes that law of the case was not the basis of the district court's decision. Maj. Op. at 7; see also 2010 Fee Award Decision, 677 F. Supp. 2d at 180.

More importantly, application of "law of the case" by a lower court, no matter how correct, cannot, as a logical matter, preclude review on the merits by a higher court. In *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800 (1988), the Court initially determined that the Federal Circuit lacked jurisdiction for the decision under review (compelling vacatur). It then examined and emphatically rejected the respondent's claim that it was entitled to preserve its victory in the Federal Circuit on a law of the case theory. The Court explained that respondent was wrong on a number of grounds, including the inconvenient fact that the first of multiple decisions on jurisdiction had rejected Federal Circuit jurisdiction. But the Court went on to give the clincher:

> Most importantly, law of the case cannot bind this Court in reviewing decisions below. A petition for writ of certiorari can expose the entire case to review. *Panama R. Co. v. Napier Shipping Co.*, 166 U.S. 280, 283-284 (1897). Just as a district court's adherence to law of the case cannot insulate an issue from appellate review, a

court of appeals' adherence to the law of the case cannot insulate an issue from this Court's review. See *Messenger* [*v. Anderson*, 225 U.S. 436], at 444 [(1912)]; *Hamilton-Brown Shoe Co. v. Wolf Brothers & Co.*, 240 U.S. 251, 257-259 (1916).

486 U.S. at 817-18.

To see why the appellate court cannot treat an issue as resolved simply because the district court has correctly applied law of the case, consider the following two scenarios. In both the district court addresses the same issue twice, and in both there had been neither an intervening trip to the court of appeals nor a final appealable judgment that would allow a party access to the court of appeals.

In the first scenario, the district court looks at the issue and decides; then, when it comes up again, the court carefully reconsiders the matter, adds new reasoning, introduces new subtleties, and comes out the same way. The court of appeals might find the new reasoning persuasive, or it might not. In any event, it would not skip the issue simply because the district court considered it twice.

In the second scenario, the district court resolves the question once, and then, on the issue's recurrence, invokes law of the case. Determining, correctly, that none of the reasons not to apply law of the case is present, it sticks with its first resolution. It would surely be nonsense to say, in this scenario, that the court of appeals cannot, or should not, face the issue (assuming it's otherwise properly presented, necessary to the outcome, etc.).

Appellees here rely on a number of decisions in which we have spoken of "law of the case" as the reason to affirm a district court decision that had applied that doctrine.

*Kimberlin v. Quinlan*, 199 F.3d 496 (D.C. Cir. 1999); *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243 (D.C. Cir. 1987) (using terms waiver and law of the case); see also *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1089-90 (1984) (similarly using terms waiver and law of the case); *United States v. Alaw*, 327 F.3d 1217, 1219 (D.C. Cir. 2003) (using term law of the case).  But in fact, as we have recognized, these cases all involved situations where a party had participated in a prior appeal that afforded an opportunity to obtain appellate reversal.  See *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 738-41 (D.C. Cir. 1995).  (*Kimberlin* and *Alaw*, though following *Crocker*, are no different in this.)  In such cases the appellate court is not abdicating substantive review on the ground that the district court properly decided not to replow what was for it old ground, but rather is justifiably treating a party as having abandoned an opportunity for appellate review.  As we observed in *Crocker*, the correct name for such a doctrine is waiver.  *Crocker*, 49 F.3d at 739; see also 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4478.6 (4th ed. 2008); *U.S. v. Henry*, 472 F.3d 910, 913 (D.C. Cir. 2007) (applying the concept under the waiver label); *Northwestern Indiana Telephone Co., Inc. v. FCC*, 872 F.2d 465, 470 (D.C. Cir. 1989) (same, but also applying "law of the case" to another issue, previously decided by our court, i.e., in the standard domain of law of the case).

But the term waiver is sensibly confined to the situation where there actually has been a *prior appeal*, as opposed to the present case, where an issue was decided in an earlier ruling that was final and appealable at the time but which the losing party never appealed on any grounds.  Wright, Miller

and Cooper classify such a case, that of a mere prior *opportunity* for an appeal, as one of "forfeiture." *Id.*[1]

Three other circuits have each, on at least one occasion, invoked the forfeiture principle to justify refusal to consider the merits of issues on appeal. See *Little Earth United Tribes, Inc. v. Dept. of Housing and Urban Development*, 807 F.2d 1433, 1438 (8th Cir. 1986); *ABC, Inc. v. Nameloc, Inc.*, 403 F.3d 607, 610-11 (8th Cir. 2005); *Griffin v. Michigan Dept. of Corrections*, 5 F.3d 186, 190 (6th Cir. 1993); *Martinez v. Roscoe*, 100 F.3d 121, 123 (10th Cir. 1996). No case from our court has applied—or, indeed, rejected—a claim of forfeiture based on failure to exercise a right to appeal a final order. Even in the waiver context, where the case for barring an unasserted claim is stronger because the case itself has already occasioned appellate court consideration, we have noted that the doctrine is "even one notch weaker" than law of the case. *Crocker*, 49 F.3d at 740. In this instance, I see no reason to treat the fee cap argument as forfeit. The 2008 Fee Award Decision was arguably a final and appealable judgment. See *Gates v. Rowland*, 39 F.3d 1439, 1450 (9th Cir. 1994). But if this is so, it was less than plainly obvious under the law of this circuit, and appellees, whose award

---

[1] Although appellees in their brief framed their argument as one of "law of the case," they acknowledged in oral argument that there was some ambiguity regarding which label to use in this instance. See Transcript of Oral Arg. at 19. And they cited cases from the Eighth Circuit that clearly invoke the principle of forfeiture, although failing to distinguish it from waiver and law of the case. See Transcript of Oral Arg. at 19, 20 (mentioning *Little Earth United Tribes, Inc. v. Dept. of Housing and Urban Development*, 807 F.2d 1433 (8th Cir. 1986); *ABC, Inc. v. Nameloc, Inc.*, 403 F.3d 607 (8th Cir. 2005)).

under the 2008 Fee Award Decision is not at issue in this appeal, were not significantly disadvantaged by appellants' failure to appeal the fee cap issue until 2010. (The bulk of the fees at issue here were incurred before the 2008 ruling and thus, obviously, well before the District had any opportunity to appeal that decision.)

*Statutory Analysis*

Although I concur in Chief Judge Sentelle's ultimate judgment that the fee cap statute permits awards of attorneys' fees up to $4,000 per student in the class, I do not agree that the fee cap statute is "plain and unambiguous" with respect to class actions. The fee cap states that

> Sec. 122. (a) None of the funds contained in this Act may be made available to pay –
>
> > (1) the fees of an attorney who represents a party in an action or an attorney who defends an action brought against the District of Columbia Public Schools under the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) in excess of $4,000 for that action; or
> >
> > (2) the fees of an attorney or firm whom the Chief Financial Officer of the District of Columbia determines to have a pecuniary interest, either through an attorney, officer, or employee of the firm, in any special education diagnostic service, schools, or other special education service providers.
>
> (b) In this section, the term "action" includes an administrative proceeding and any ensuing or related proceedings before a court of competent jurisdiction.

2006 District of Columbia Appropriations Act § 122; Pub. L. No. 109-115, 119 Stat. 2396, 2519 (2005), cont'd in effect, Revised Continuing Appropriations Resolution, § 101(a)(9), Pub. L. No. 110-5, 121 Stat. 8, 9 (2007).

A literal reading of the statute would award $4,000 to every individual attorney who represents a party. As Chief Judge Sentelle's opinion points out, this would lead to an absurd result. A per party cap also cannot be understood literally, as it would seem to imply a ceiling of $8000 when two parents sue on behalf of their child, as each would be "a prevailing party who is the parent of a child with a disability." See 20 U.S.C. § 1415(i)(3)(B). Instead, one must read "party" to refer to a student, or the student's parent or parents suing on behalf of the student, or both (but never adding up to more than one party per student whose education is at issue).

What is less clear is whether the $4,000 fee cap should be read to apply per student or per action. The phrase "fees of an attorney who represents a party in an action" seems to imply a $4,000 per student reading because it suggests that the relevant unit of analysis is *a party* in an action. 2006 District of Columbia Appropriations Act § 122(a)(1). But the language at the end of the same clause—"in excess of $4,000 for that action"—cuts in favor of the per action interpretation as it implies that the $4,000 limit applies to actions as a whole. *Id.* Under the per student reading, the fee cap applies to "an attorney who represents a party in an action" and the phrase "$4,000 for that action" merely clarifies the scope of representation of a party that the fee cap applies to. *Id.* In other words, an attorney may receive $4,000 for each separate action in which they represent a party or $4,000 for each separate party they represent in a single action. Under the per action reading, the fee cap limits fees paid to an attorney (or attorneys) "for that action" and the phrase "an attorney who represents a party in an action" merely specifies the type of

attorney (i.e., an attorney who either brings or defends an IDEA suit) whose fees are subject to the cap. *Id*. On that reading, an attorney may not receive more than $4,000 for a single action regardless of the number of parties represented in that action.

Both readings of the statute are plausible. The statutory language provides clear guidance in cases where each action concerns one student. But I see no "evident intent" of Congress with respect to class actions. If Congress had thought about class actions even in the slightest, it would have provided more explicit instruction on how to deal with them. All that is clear is that Congress intended that the fee cap be no more than $4,000 per student and no less than $4,000 per action. But this leaves two plausible interpretations that entail wildly different results in the class action context.

Just as the explicit text is ambiguous, it is difficult to identify a policy implicit in the statute that offers clear guidance for our case. The fee cap statute balances Congressional concern with the diversion of funds from District schools to plaintiffs' attorneys with the desire to provide some source of funding for legal representation of poor children with worthy claims. For cases involving individual students, Congress evidently decided that a $4,000 fee cap would represent a reasonable balance of these considerations. Class actions offer the possibility of economies of scale in litigation by resolving the claims of many similarly situated parties in one action rather than forcing each individual claim to be brought as a separate action. The time of plaintiffs' attorneys is one of the many resources on which a class action may economize. The cost of legal representation per student in a class action could be expected to be lower, perhaps much lower, than those in individual actions. So it is doubtful that someone who believed that a $4,000 per student fee cap struck a reasonable

balance between protecting the District's fisc and securing legal representation for poor children would also believe that the same $4,000 per student was the best fee cap in class actions. And there is surely some anomaly in construing a cap that to a degree serves to constrain overlawyering as having no such beneficent effect in a class action. But it seems even less likely that the drafters could have thought that a $4,000 per action fee cap for a case involving thousands of students would provide for adequate legal representation. Instead, the policy logic of the statute suggests that the fee cap for large class actions should be something less than $4,000 per student but more than $4,000 per action. Unfortunately, this is not one of the two plausible interpretations of the statutory language. The text of the statute forces us to choose between two extreme outcomes.

On balance, I believe that the $4,000 per student interpretation is a somewhat superior reading. As Chief Judge Sentelle's opinion observes, the $4,000 per action rule would provide a perverse incentive to break class actions into multiple individual actions so as to receive higher attorneys fees. Furthermore, while Congress evidently decided that $4,000 was ample compensation for an attorney representing an individual student, it is difficult to see how the same compensation could be reasonable for a much larger, longer and more complex class action. Whereas a $4,000 cap on fees in a suit brought by an individual student seems unlikely to force impecunious parents to rely on pro bono legal services, a $4,000 fee cap on a class action would likely have just this effect. By contrast, since Congress was willing to permit the District to spend the aggregate of $4,000 per student on fees in individual cases, it plainly had no clear opposition to the aggregate cost that a per student rule imposes on the District in this case. Finally, the fee shifting statute itself provides that fees may be awarded "to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B).

Given that fee awards are made to parents of a student, it seems fitting to read the cap on these fees as applying per student rather than per action.